# ATTACHMENT 3

Westlaw.

Slip Copy                                                                                                         Page 1
Slip Copy, 2005 WL 1527801 (D.Mass.)
**(Cite as: Slip Copy)**

C
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
Shawnee CARIFIO, Plaintiff,
v.
BENETTON SPORTSYSTEM USA, INC.,
Defendant.
**No. Civ.A. 02-11985-DPW.**

June 21, 2005.

John B. Fleming, Mark D. Lipton, Sarrouf, Tarricone & Flemming, Stanley D. Helinski, Hugo & Pollack, Boston, MA, for Plaintiff.
Kevin G. Kenneally, Michael P. Roche, Donovan & Hatem, LLP, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER*

WOODLOCK, J.
*1 Shawnee Carifio seeks judgment against Benetton Sportsystem USA, Inc. ("Benetton")-manufacturer and distributor of her Rollerblade® e4.2 in-line skates-claiming the brake for the skates failed while she was wearing them, causing her to crash and sustain injuries as a result. Ms. Carifio contends that by manufacturing and distributing in-line skates whose negligent design made them unfit for ordinary and foreseeable recreational use, Benetton breached its implied warranty of merchantability and also that the company's negligent design and manufacture directly and proximately caused her injuries. Benetton has moved for summary judgment and in that connection to exclude expert testimony offered by Ms. Carifio as unsupported and unreliable. Benetton claims that Ms. Carifio is barred from recovery because she unreasonably used the skates.

Finding that Ms. Carifio's expert witness is qualified and proffers an admissible explanation for the skates' failure, I will deny the Motion to Exclude. As to the merits, I find a genuine issue of material fact exists regarding whether Ms. Carifio unreasonably used the skates with knowledge of an existing product defect. Accordingly, Benetton's Motion for Summary Judgment will be denied.

I. FACT SUMMARY

The statement of percipient facts for purposes of these motions is derived solely from Ms. Carifio's testimony at deposition.

Ms. Carifio, a self-described proficient skater, was a daycare teacher in Peabody, Massachusetts, during the relevant time period. She was injured on July 9, 1999, while in-line skating with her young students in the parking lot behind the school where she taught. According to Ms. Carifio, she had set the brake on her Rollerblade® e4.2 in-line skates the previous day, after removing a rock that had become lodged between the skate brake and wheel. On the day of the accident, she inspected and tested the brake before setting off to skate down a paved hill, with her students following in a line behind her. The brake worked when she initially tried it and she proceeded down the hill. But, when she attempted to apply the brake again, she did not feel it engage. Although Ms. Carifio tried other means of stopping, she could not decelerate and she collided with a cement block in a cemetery adjacent to the school.

As a result of the collision, Ms. Carifio incurred a head injury, broken nose, facial lacerations, and elbow and wrist injuries. She suffered a concussion and has little recollection of paramedics transporting her to the hospital.

Ms. Carifio testified that she did not know how the accident occurred. She inferred that the skates' brake malfunctioned from the fact that it had engaged every time previously and this time she did not feel it "go down." [FN1] Some time after the accident, Ms. Carifio noticed that the brake pad had moved up from the position she had set it to the day before the accident.

> FN1. Rollerblade® e4.2 in-line skates employ a braking mechanism called Active Brake Technology, abbreviated ABT 2. The ABT2 system has an adjustable brake pad on one skate, which must be periodically repositioned as it wears down. To reposition the brake the user must raise a spring-loaded locking tab, slide the brake pad along a brake height adjustment strip to a position that would properly make contact with the ground when engaged, and then release the locking tab to secure the brake pad to that setting. Metal teeth on the tab hold the brake

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-11129-DPW    Document 85-3    Filed 02/17/2006    Page 3 of 6

Slip Copy                                                                                                    Page 2
Slip Copy, 2005 WL 1527801 (D.Mass.)
(Cite as: Slip Copy)

pad in place. To engage the brake, the user extends the braking foot forward, whereby the pressure of the skater's calf against the rear cuff of the skate boot forces the brake pad down to the ground, thereby slowing the skater.

Despite having received and read product warnings advising users to wear protective gear, Ms. Carifio did not wear a helmet, knee pads, or elbow pads while skating. She was, however, wearing wrist guards and gloves at the time of the accident. Ms. Carifio required her students either to wear protective gear while skating or to have their parents sign liability waivers.

*2 Although Ms. Carifio is unable to provide an exact accounting for the whereabouts of her skates during the time she was hospitalized, after being discharged from the hospital she stored the skates at her parents' home and then at the office of her attorney. Both Ms. Carifio and her attorney assert that, to the best of their knowledge, the skates were not altered or mishandled in the four-year interval between the accident and when the skates were examined by the expert witness.

II. DISCUSSION

A. Motion to Exclude Expert Opinion

Liability in the present case hinges on the explanation of how a product involving what Benetton terms "complex principles of materials engineering, metallurgy, brake technology, and perhaps biomechanics" functions. Expert testimony on the issue of causation may be required when the product in question consists of "a number of relatively complex working parts." _Makuc v. American Honda Motor Co., Inc.,_ 835 F.2d 389, 392 (1st Cir.1987). Specifically, where inferences of causation would be outside a factfinder's realm of common knowledge, _id._ (citing _Calvanese v. W.W. Babcock Co., Inc.,_ 10 Mass.App.Ct. 726, 734 n. 9, 412 N.E.2d 895 (1980)), expert testimony is necessary to assist the factfinder to understand the evidence and determine the facts in issue.

1. Standard of Review

Expert opinion testimony must be "based upon sufficient facts or data" and be the "product of reliable principles and methods" applied "reliably to the facts of the case." Fed.R.Evid. 702. Where the facts in issue necessitate expert testimony but do not clearly point to a determinative cause of the accident, an expert may infer a "plausibl[e]" explanation from the evidence. _Pace v. Ins. Co. of N. Am.,_ 838 F.2d 572, 578 (1st 1988). However, "the inferences must be reasonable and must be based on probabilities rather than possibilities and may not be the result of mere speculation and conjecture." _Goffredo v. Mercedes-Benz Truck Co.,_ 402 Mass. 97, 101, 520 N.E.2d 1315 (1988) (citing _Poirier v. Plymouth,_ 374 Mass. 206, 212, 372 N.E.2d 212 (1978)); see also _Fidalgo v. Columbus McKinnon Corp.,_ 56 Mass.App.Ct. 176, 182-83, 775 N.E.2d 803 (2002). Speculative testimony will not satisfy a plaintiff's burden of establishing by a preponderance of the evidence that a design defect was the proximate cause of her injuries. _Fidalgo,_ 56 Mass.App.Ct. at 183, 775 N.E.2d 803. Furthermore, unsupported expert testimony does not create a genuine issue of material fact sufficient to defeat summary judgment. _Magarian v. Hawkins,_ 321 F.3d 235, 240 (1st Cir.2003).

2. Analysis

Benetton opposes consideration of the opinion offered by Ms. Carifio's expert witness Igor Paul. First, Benetton claims that Paul's opinion is factually unsupported. Second, Benetton contends that Paul is unqualified to deliver relevant testimony in this case.

In support of its argument regarding lack of factual support, Benetton purports to contrast Paul's version of events with Ms. Carifio's. Benetton alleges that Paul's opinion is unsupported by and contrary to the true facts of the case, thereby "invent[ing] a whole cloth sequence of events at odds with sworn testimony." In support of this argument, Benetton points to the following excerpt from Paul's report:
*3 As [Plaintiff] used the brake when she started to descend the hill, the brake worked again as expected. However, when she tried to brake harder, the brake suddenly stopped to contact the ground and failed to work even when she pushed her foot further forward. She was unable to brake and lost control, resulting in her collision and severe injuries.

Benetton then compares this recitation of the "facts" with an account provided by Ms. Carifio during her deposition:Q: Do you know whether that happened?
A: No. As I said I don't know what happened.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The quotation from Ms. Carifio's deposition testimony is incomplete. Ms. Carifio did testify that she did not know how the accident happened and could only speculate as to its cause. Considering the entirety of her testimony, however, it appears that her lack of knowledge concerned what she described in her Opposition as the "specific mechanical way the braking mechanism failed," rather than the entire course of events leading up to the accident. In testimony not cited by Benetton but referenced *supra* in Section I, Ms. Carifio recounted the underlying events in a manner seemingly consistent with Paul's description set forth above. Briefly restated, Ms. Carifio testified that when she initially tried the brake it worked, but that on her next attempt to brake she did not feel the brake engage.

When considered in connection with markings found by Paul on the brake height adjustment strip-markings indicating to him that the brake pad had moved up on the strip as a result of incomplete engagement of the adjusting tab's metal teeth-there exists a sufficient basis for him reasonably to infer the probable cause of the accident without relying on mere speculation. That there also may be other markings on the skates goes to the weight, not the admissibility, of his expert opinion.

Benetton argued at a June 16, 2005 hearing that Paul's testimony that "partial" engagement of the locking tab caused the brake pad to slip to its uppermost position belied Ms. Carifio's insistence at her deposition that she had properly locked the brake into place the day before the accident and had tested it to ensure that it was working. Ms. Carifio testified during her deposition that she had locked the brake into place by "clos[ing] the little lever [locking tab]." Ms. Carifio further testified that after the accident she found the brake was still locked, but that it had moved up from where she had set it. These lay observations by Ms. Carifio, however, do not render inadmissible Paul's expert opinion that the locking tab's metal teeth were only partially holding the brake pad in place. [FN2]

> FN2. Benetton requested leave to file a reply affidavit in response to Ms. Carifio's Opposition. Because I must view the record in the light most favorable to the plaintiff, such a reply affidavit, to the degree it contradicts Paul's opinion, cannot have an impact on the factual evaluation I conduct to determine whether there is a genuine issue of material fact as to the cause of the accident. I find there is such an issue, but it is the responsibility of the jury, not the court, to resolve it. Accordingly, Benetton's Motion for Leave to File Reply Affidavit will be denied.

Benetton also attacks Paul's opinion as unreliable because the skates, in the four years that passed between the accident and the time of his inspection, were handled by paramedics, hospital personnel, Ms. Carifio's parents, attorneys, and Ms. Carifio herself. However, Ms. Carifio testified that neither she nor anyone else, to the best of her knowledge, altered the skates after the accident. Furthermore, Ms. Carifio's attorney attested that the skates were carefully preserved for inspection after she brought them to him for storage. Benetton has presented no affirmative evidence, apart from speculation regarding the chain of evidence, that the skates were altered, mishandled, or changed in any way that would undermine the reliability of Paul's expert opinion.

*4 As a third ground for objecting to Paul's expert testimony, Benetton points out that he failed to perform testing that would help support his conclusions. Paul's report, however, states that he did, in fact, perform tests on both Ms. Carifio's skates and an exemplar pair. Benetton points to no specialized testing that might be required as a matter of law beyond that which Paul conducted.

Finally, Benetton contends that Paul lacks specialized knowledge in the design, manufacture, testing, and use of in-line skates and, therefore, is unqualified to give relevant testimony. Paul is a registered professional engineer and possesses three advanced degrees in mechanical engineering. He has taught product and machine design and design safety at the Massachusetts Institute of Technology for more than forty years and has consulted extensively in these topical areas. Bearing in mind the wariness with which courts should approach the testimony of the "all-purpose engineer," I find on the record before me that Paul's engineering expertise is adequate for purposes of admissibility here, where the design issues implicated-the interaction of grips and locking mechanisms-are governed by basic principles of physics and engineering. *See Chapman v. Bernard's Inc., 167 F.Supp.2d 406, 420-21 (D.Mass.2001)* (holding that an expert's "general engineering expertise" was sufficient where "the design defect at issue turns on the interaction of metal tubes, bolts, springs and various stressors thereon which seem[ ]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

... to be the subject of basic engineering expertise").

B. Motion for Summary Judgment

I turn now to the substance of the summary judgment motion and Benetton's claim that Ms. Carifio is barred from relief by her "unreasonable use" of the product.

1. Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir.1991) (internal quotation marks and citation omitted). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists when a factfinder could reasonably return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden is upon the party seeking summary judgment to make a preliminary showing that no genuine issue of material fact exists. *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). Once the moving party has satisfied its burden, the burden shifts to the non-moving party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *Id.* The Court must view the record, and all reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *Chapman*, 167 F.Supp.2d at 411 (citing *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993)).

2. Analysis

*5 Under Massachusetts law, to establish her claim that Benetton breached its implied warranty of merchantability, Ms. Carifio must prove that the skates were in a defective condition when they left Benetton's possession. *Makuc*, 835 F.2d at 392-93. Because products may fail due to abnormal use or other secondary causes, a malfunction in and of itself is insufficient to establish breach of warranty. *Id.* at 393. In order for the inference of a product defect to be drawn from the product's malfunctioning, the plaintiff must eliminate other reasonable causes of the malfunctioning. *Id.*

An available design modification that would improve product safety without imposing an undue cost on the manufacturer or interfering with the product's performance can establish a product defect. *Colter v. Barber-Greene Co.*, 403 Mass. 50, 57, 525 N.E.2d 1305 (1988). Here, as an alternative to Benetton's brake locking system, Paul suggested a "positive latch" design that he contended would ensure complete engagement of the metal teeth and positive and secure locking of the brake pad. In addition, he suggested that changes to the product's current design-such as a color-coded tab understructure that would reveal red portions if the latch was not completely locked, prominent warnings about the danger of incomplete engagement, and instructions on checking for complete and positive locking-would have made the product safer for users without unduly increasing its cost. These suggestions provide a sufficient basis for a reasonable factfinder to find the existence of a product defect.

If fault lies with the manufacturer for defective design or failure to warn consumers, the manufacturer bears strict liability for breach of warranty under Massachusetts law. Massachusetts courts "hold a manufacturer liable for defectively designed products because the manufacturer is in the best position to recognize and eliminate the design defects." *Colter*, 403 Mass. at 57, 525 N.E.2d 1305 (citing *Solimene v. B. Grauel & Co., KG*, 399 Mass. 790, 796, 507 N.E.2d 662 (1987)). Thus, in analyzing breach of warranty of marketability claims, the focus is on the product itself rather than on the actions of the plaintiff, *Cipollone v. Yale Indus. Products, Inc.*, 202 F.3d 376, 379 (1st Cir.2000), and contributory and comparative negligence analysis is irrelevant.

If a product defect exists, a defense to a manufacturer's strict liability for design defect or failure to warn in a breach of warranty case may be available where the plaintiff has unreasonably used the product knowing it to be defective and dangerous. A plaintiff has a duty to use a product reasonably, and when he "proceeds to use a product which he knows to be dangerous, he ... relinquishes the protection of the law...." *Chapman*, 167 F.Supp.2d at 416 (quoting *Correia v. Firestone Tire & Rubber Co.*, 388 Mass. 342, 355, 446 N.E.2d 1033 (1983). A defendant employing the so-called "unreasonable use" defense "must prove that the plaintiff knew of the product's defect and its danger, that he proceeded

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-11129-DPW   Document 85-3   Filed 02/17/2006   Page 6 of 6

Slip Copy
Slip Copy, 2005 WL 1527801 (D.Mass.)
(Cite as: Slip Copy)

Page 5

voluntarily and unreasonably to use the product and that, as a result, he was injured." *Allen v. Chance Mfg. Co.,* 398 Mass. 32, 34, 494 N.E.2d 1324 (1986). To that end, Benetton must prove that Ms. Carifio knew of both the product's defect *and* also the danger it created. *Velleca v. Uniroyal Tire Co., Inc.,* 36 Mass.App.Ct. 247, 249, 630 N.E.2d 297 (1994) (holding that "[k]nowledge that a product is dangerous, standing alone, is not enough" to bar warranty recovery by a plaintiff and that the defendant must also establish that the plaintiff "knew the danger created by the defect").

**\*6** Ms. Carifio has testified that she knew that in-line skating was dangerous, but Benetton has failed to establish as a matter of law that she was aware of the product defect she alleges-*i.e.,* an unreliable design that would enable the brake to fail if the locking tab was not properly set. As a result, a genuine issue of material fact precludes summary judgment for Benetton based on the "unreasonable use" defense it asserts.

### III.

For the reasons set forth above, Benetton's motions to exclude the expert opinion (No. 37), for summary judgment (No. 34), and for leave to file a reply affidavit (No. 42) are DENIED.

D.Mass.,2005.
Carifio v. Benetton Sportsystem USA, Inc.
Slip Copy, 2005 WL 1527801 (D.Mass.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.