*TAB C*



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
(Cite as: 2003 WL 23112398 (D.Mass.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
OXFORD GLOBAL RESOURCES, INC., Plaintiff,
v.
Sabatino GUERRIERO, David Smith, and Matthew D'Agostino, Defendants.
No. Civ.A. 03-12078-DPW.

Dec. 30, 2003.

Christopher R. O'Hara, David H. Rich, Julie E. Green, Todd & Weld, LLP, Boston, MA, for Plaintiff.

Christa C. von der Luft, Edward P. Leibensperger, Nutter, McClennen & Fish, LLP, Boston, MA, for Defendants.

Christopher R. O'Hara, Todd & Weld LLP, Boston, MA, for Counter Defendant.

*MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION*

WOODLOCK, J.

*1 Plaintiff Oxford Global Resources ("Oxford"), a Massachusetts-based company, seeks a preliminary injunction barring its former employees, Sabatino Guerriero, David Smith, and Matthew D'Agostino (collectively, "Defendants"), now all based in Texas, from soliciting Oxford's customers and disclosing confidential information.

I. BACKGROUND
A. *Oxford's Business*
Oxford is a national contract employment placement firm that connects highly skilled computer professionals (which it calls "contractors" or "consultants") seeking temporary employment with companies (which it calls "clients") that require temporary skilled assistance. "Account managers" and "sales associates" at Oxford work primarily with employer clients (or, more precisely, the specific hiring managers at those employers), whereas "recruiters" work primarily with contractors. [FN1] The information that Oxford holds concerning clients and contractors is a mix of the otherwise publicly available, such as resumes found on the Internet, and the proprietary, which Oxford gains through more intensive investigation. The proprietary information includes, *inter alia,* how much a particular client is willing to pay; whether a given client hiring manager has the actual authority to make a hire; whether a given hiring manager is willing to hire based on a resume provided by Oxford and a telephone interview; details about clients' projects and contractors' technical practice area preferences; lead time required by individual contractors for change of employment; and contractors' geographical flexibility. Oxford's customer information is stored in a secure database, to which employees have access, with some restrictions.

> FN1. For simplicity, I use the phrase "customers" when referring jointly to clients and contractors, though that term is not generally used by the parties.

Each Oxford employee has an exclusive list, sometimes called an "A list" or "A layer," of customers whom only that employee may handle. There is some dispute as to how a customer makes it onto the A list.

Oxford claims that a contractor becomes part of a recruiter's A list when the recruiter has established a level of rapport with the contractor, and that a client becomes part of an account manager's A list only after a rigorous evaluation process including criteria such as the length of assignment, budget status, skill set required, rate the client is willing to pay, location of work, and willingness to hire based on a resume and a telephone interview.

On the other hand, defendants claim that customers could qualify for an employee's A list if only the barest information were known. According to defendants, all that a recruiter needed to know about a contractor to add him to the A list was name, resume, skill set, hourly rate, and date available; all that a sales associate or account manager needed to know about a client to add him to the A list was current contractor usage, desired pay rate (often guessed), and expected hiring date (also often

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-11129-DPW    Document 93-4    Filed 03/13/2006    Page 3 of 13

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
(Cite as: 2003 WL 23112398 (D.Mass.))

guessed).

Oxford views its confidential database, and the goodwill it builds with clients and contractors, as a valuable asset, painstakingly built through "bridges of trust" and Oxford's reputation with clients for providing appropriate contractors based on proprietary information. [FN2]

> FN2. Defendants argue that goodwill has little value in the placement business. They state that contractors do not take positions because of their relationship with the recruiter, but rather deal simultaneously with multiple placement agencies in pursuit of the best placement at the highest hourly rate. Conversely, defendants claim, corporate hiring managers work with multiple placement agencies to find the most qualified contractors at the lowest hourly rates. Thus, defendants assert that a previous successful relationship with a particular recruiter or account manager, or placement firm as a whole, has little or no influence on a customer's behavior--i.e., that goodwill is not a meaningful business asset for Oxford that defendants could have damaged.

B. *Defendants' Employment with Oxford*
1. *Sabatino Guerriero*

*2 Sabatino Guerriero began working at Oxford's Peabody, Massachusetts office in early August 1995. [FN3] As part of the offer of employment, Oxford advised Guerriero that he would be required to sign a non-competition agreement. On his first day at work, Guerriero signed an employment agreement containing non-competition, non-solicitation, and non-disclosure clauses. The agreement provided, *inter alia,* that, following the termination of Guerriero's employment, he would not "for a period of twelve months call on any temporary employee candidates or corporate customers with whom [he] directly or indirectly worked or in any way communicated" during the last twelve months of his employment.

> FN3. Technically, he began working at Oxford & Associates, Inc., Oxford's corporate predecessor. That has no bearing on this case.

During the next five years, Guerriero received several promotions, and in September 2000 was invited to open and direct Oxford's new Chandler, Arizona office. As part of that transfer, he was required to distribute his then-existing A list of approximately 200 clients to other Oxford employees. In Arizona, Guerriero supervised some ten to fifteen account managers and recruiters, who each had an A list of approximately 300 names; he also maintained his own (new) A list of some 100 clients. It is undisputed that Guerriero had potential access to all of those names and their accompanying information, though Guerriero contends that he delegated approval of A lists to a subordinate and spent most of his time on purely managerial duties, not contacting customers.

In December 2002, Guerriero returned to Beverly, Massachusetts to manage that office. There, he supervised approximately twenty-five to thirty account managers and recruiters, each with an A list of approximately 300 names, and also maintained his own A list of sixty clients. Again, it is undisputed that Guerriero had potential access to all of his subordinates' customer names and information, though Guerriero contends that he delegated most A list approval to others, rarely reviewed his subordinates' A lists, and spent most of his time on purely managerial duties, not contacting customers. In an exhibit to the Second Declaration of Bruce Winchester, Oxford has submitted what it maintains is Guerriero's A list for his last year of employment, containing 156 clients.

On June 23, 2003, Guerriero abruptly resigned from Oxford.

2. *David Smith*

David Smith began working at Oxford's Peabody, Massachusetts office in early September 1996. As with Guerriero, his offer of employment advised him that he would be required to sign a non-competition clause, and on his first day of work, he did so.

Smith worked as a recruiter in Peabody until about January 2000. After that, he was rapidly promoted and transferred, first in January 2000 as a Segment Manager in Peabody, then in September 2000 as Site Manager of the Jupiter, Florida office, and then in October 2001 as Site/Division Manager of the Federal Way, Washington office. In Federal Way, he supervised some fourteen to twenty-one account managers and recruiters. Collectively, his subordinates' A lists numbered some 1300-1800 clients and 1300-1400 contractors, and Smith's own A list contained about 130 contractors. Smith spent approximately two-thirds of his time on management,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-11129-DPW    Document 93-4    Filed 03/13/2006    Page 4 of 13

Not Reported in F.Supp.2d                                                                                               Page 3
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
(Cite as: 2003 WL 23112398 (D.Mass.))

and one-third on recruiting contractors. Again, it is undisputed that Smith had potential access to all of his subordinates' customer names and information, though Smith contends that, at least during the last year of his employment, he delegated most A list approval to others, rarely reviewed his subordinates' A lists, and was actively involved in only thirty to forty-five placements. In an exhibit to the Second Declaration of Bruce Winchester, Oxford has submitted what it contends is Smith's A list for his last year of employment, containing 212 contractors.

*3 On June 20, 2003 Smith abruptly resigned from Oxford.

3. *Matthew D'Agostino*

Matthew D'Agostino began working at Oxford's Peabody, Massachusetts office in June 2000. As with Smith and Guerriero, his offer of employment advised him that he would be required to sign a non-competition clause, and on his first day of work, he did so.

D'Agostino worked as a recruiter in Peabody until August 2001, when he was promoted to a low-level managerial position and transferred to Federal Way, Washington. There, he had approximately 300-350 contractors on his own A list, and access to his subordinates' A lists, which comprised a total of some 200- 340 contractor names. While he never had authority to approve A list additions, either for his subordinates or himself, he could access his subordinates' A lists, and did so about once a month. In an exhibit to the Second Declaration of Bruce Winchester, Oxford has submitted both what it maintains is D'Agostino's A list for his last year of employment, containing 590 contractors, and an additional list of 26 contractors that it says D'Agostino placed during his last year of employment.

After a dispute involving the circumstances of his transfer to Washington, his ability to return to Massachusetts, and his being passed over for promotion twice, D'Agostino resigned on July 11, 2003.

C. *Defendants' Employment with an Oxford Competitor*

After leaving Oxford, each defendant went to work for Diversified Corporate Resources, Inc. ("DCRI")-- a competitor of Oxford--in Austin, Texas. [FN4] Smith and D'Agostino mainly recruit contractors, and Guerriero mainly works with corporate clients.

Oxford alleges that each defendant contacted customers that were on his or his subordinates' A lists during the last year of his employment, and in doing so took advantage of proprietary information that he had learned at Oxford, in violation of the non-competition, non-solicitation, and non-disclosure clauses. [FN5] Oxford provides specific names of contractors and clients that, it alleges, one or more defendants contacted.

> FN4. Portions of the record refer to defendants' employer as International Data Search ("IDS"). IDS is a division of DCRI.

> FN5. Oxford does not allege that any of the defendants took copies of any material, such as client lists, contractor lists, pricing or billing information, when they left Oxford.

Defendants generally respond that: (1) they did not memorize enough information to substantially reconstitute their own A lists, let alone those of their subordinates; (2) if they happen to find an Oxford customer, it is through means that do not involve use of Oxford information. For instance, Smith explains that he primarily finds contractors by Internet searching, by asking contractors that he has contacted whether they know of other contractors looking for work, and by cold-calling corporate telephone numbers similar to those of known contractors on the theory that corporations tend to group contractors together in their phone system.

D. *Procedural History*

In August 2003, Oxford learned that defendants were working for DCRI, and on August 28 sent a letter to DCRI alleging that defendants were improperly contacting Oxford customers, and requesting them to stop. On September 3, 2003 DCRI sent a letter requesting that Oxford identify the customers that it believed defendants should refrain from contacting. On September 13, 2003 Oxford sent a letter declining to provide this information. Oxford filed this complaint on October 6, 2003, and moved for a preliminary injunction on November 21, 2003. Hearings on the motion were conducted on December 15, 2003 and December 29, 2003.

II. DISCUSSION
A. *Standard for Preliminary Injunction*
*4 "A party seeking a preliminary injunction must establish that (1) it is substantially likely to succeed on the merits of its claim; (2) absent the injunction there is 'a significant risk of irreparable harm'; (3) the balance of hardships weighs in its favor; and (4) the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                             Page 4
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
**(Cite as: 2003 WL 23112398 (D.Mass.))**

injunction will not harm the public interest." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 33 (1st Cir.1998) (quoting *TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 544 (1st Cir.1996). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir.1996). The greater the likelihood of success on the merits, the less risk of irreparable harm to the plaintiff must be shown. *Id.* at 19. In addition, because a preliminary injunction is an equitable remedy, "a court may properly consider any inequitable conduct by the plaintiff." *Hannon v. Allen*, 241 F.Supp.2d 71, 73 (D.Mass.2003).

### B. *Likelihood of Success on the Merits*
#### 1. *Choice of Law*

This court, when sitting in diversity, applies the choice of law rules of Massachusetts. *See Klaxon v. Stentor Elec.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The parties dispute the choice of substantive law in this case.

The employment agreements signed by defendants, which contain the non-competition, non-solicitation, and non-disclosure clauses at issue here, contain a choice of law provision selecting Massachusetts law as the governing substantive law. In general, Massachusetts respects contractual choice of law provisions. *See Morris v. Watsco, Inc.*, 385 Mass. 672, 674-75, 433 N.E.2d 886 (1982). However, defendants rely on an important exception. Massachusetts will not apply a choice of law provision if doing so " '[1] would be contrary to a fundamental policy of a state; which has [2] a materially greater interest than the chosen state in the determination of the particular issue; and which ... [3] would be the state of the applicable law in the absence of an effective choice of law by the parties." ' *Roll Sys., Inc. v. Shupe*, 1998 WL 1785455, *2 (D.Mass.1998) (alterations in original) (quoting *Shipley Co. v. Clark*, 728 F.Supp. 818, 825 (D.Mass.1990) (quoting Restatement (Second) of Conflict of Laws [hereafter "Restatement"] § 187(2)(b) (1971))).

Defendants rely on this exception, and claim that: enforcement of the non-compete provision would be contrary to a fundamental policy of Texas against such clauses; Texas has a materially greater interest in the issue than Massachusetts; and that Texas law would apply absent the choice of law clause. Because I find that Massachusetts law would apply even without the clause, I conclude that defendants fail to meet the third prong of this exception, and therefore the choice of Massachusetts law provision is enforceable.

Absent a choice of law provision, a Massachusetts court would apply a "most significant relationship" test to determine which state's law would apply. Under this test, a variety of factors would be considered:

*5 1) the place of contracting; 2) the place of negotiation of the contract; 3) the place of performance; 4) the location of the subject matter of the contract; and 5) the domicile, residence, nationality and place of incorporation of the parties; 6) the needs of the interstate and international system; 7) the relevant policies of the forum; 8) the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue; 9) the protection of justified expectations; 10) the basic policies underlying the particular field of law; 11) certainty, predictability and uniformity of result; and 12) ease in the determination and application of the law to be applied.

*Dunfey v. Roger Williams Univ.*, 824 F.Supp. 18, 20 (D.Mass.1993); *Bushkin Assoc., Inc. v. Raytheon Co.*, 393 Mass. 622, 632, 473 N.E.2d 662 (1985); Restatement §§ 6(2), 188(2).

Defendants' core argument is that, because they currently live and work in Texas, their ability to earn a livelihood should be determined under Texas law. [FN6] But virtually every other factor in the analysis points to Massachusetts law. Oxford is headquartered in Massachusetts, and virtually all of its senior management works there. All three defendants applied to, and began working at, Oxford's Massachusetts offices. All three defendants executed an employment agreement in Massachusetts. All three defendants performed a significant portion of their employment with Oxford in Massachusetts--for Guerriero, five-and-a-half of his eight years; for Smith, four of his seven years; for D'Agostino, one-and-a-half of his three years. At no point did any defendant ever work for Oxford in Texas, nor did any defendant advise Oxford, before or during his employment there, that he ever intended to move to Texas. In short, the *only* connection Texas has to this case is that it is where defendants happened to choose to relocate after leaving Oxford.

> FN6. Somewhat listlessly, defendants attempt to address other factors under the Restatement test, noting that: Oxford is not incorporated in Delaware, not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-11129-DPW    Document 93-4    Filed 03/13/2006    Page 6 of 13

Not Reported in F.Supp.2d                                                                                                        Page 5
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
(Cite as: 2003 WL 23112398 (D.Mass.))

Massachusetts; defendants partially performed the contract in states other than Massachusetts (but not Texas); Guerriero executed the second non-compete agreement in Arizona; and Oxford has offices outside Massachusetts, including Texas, although defendants never worked at Oxford's Texas office. These factors neither detract from the interest of Massachusetts in this issue, nor add to the interest of Texas.

The circumstance presented by this dispute--where ex-employees, living in a state that takes a dim view of non-compete clauses, contest a choice-of-law provision with their former employer, based in a state that enforces them vigorously--recurs frequently in the cases. The cases divide into two lines. In one line, an employer based in an "enforcing" state (e.g., Massachusetts) reaches out into a "non-enforcing" state (e.g., Texas) for the purpose of hiring an employee in that state, and, when the inevitable dispute arises, seeks to apply the enforcing state's law. *See, e.g., La. Transp., Inc. v. Race,* 2002 U.S. Dist. LEXIS 19571, *2 (N.D.Tex.2002) (Michigan employer acquired a business in Texas; defendant was existing Texas employee who remained in Texas throughout her employment); *Roll Sys.,* 1998 WL 1785455, at *1 (Massachusetts employer hired California resident to work in California); *Aware, Inc. v. Ramirez-Mireles,* 13 Mass. L. Rptr. 257, 2001 WL 755822, *1 (Mass.Super.Ct.2001) (Massachusetts employer hired California resident to work in California); *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 675 (Tex.1990) (Florida company hired employee specifically to work in Texas). In these cases, courts sometimes find it unfair to apply the law of the enforcing state because doing so would allow the out-of-state employer to limit the employee's freedom to work when a local employer could not do the same. "An employee of one out-of-state employer might take a competing job and escape enforcement of a covenant not to compete because of the law of another state, while a neighbor suffered enforcement of an identical covenant because of the law of a third state." *DeSantis,* 793 S.W.2d at 680.

*6 In the other line of cases, however, an employee based in an enforcing state begins working at an employer in that state, and after ending his employment, moves to a non-enforcing state, and then, in the subsequent dispute, seeks to avoid application of the enforcing state's law. *See, e.g., Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.,* 968 F.2d 1463, 1465-66 (1st Cir.1992) (New Hampshire employee worked for New Hampshire employer, then moved to California after ending employment). In these cases, courts generally find it unfair to apply the law of the non-enforcing state and thereby allow the employee to escape the obligations of the contract by, in essence, fleeing the jurisdiction. Courts endeavor to protect "justified expectations" formed at the time of contract formation. Neither an employer nor an employee examining an employment agreement could justifiably expect it to be governed by the law of a state that has no relation whatsoever other than the employee will someday happen to be in it when he breaches the contract. *See Ferrofluidics,* 968 F.2d at 1467-68. Here, neither Oxford nor any defendant could reasonably have anticipated that Texas law would have any relevance to the employment agreements when they were executed, or indeed at any time during defendants' employment.

In short, this case involves a controversy, now disputed in a Massachusetts forum, over a contract negotiated and executed in Massachusetts, by parties then all resident in Massachusetts (including a plaintiff long headquartered here), for services that were performed largely in Massachusetts. Defendants' current residence in Texas is that state's only connection to this dispute, and the interest of Texas in protecting immigrants from their Massachusetts employment agreements is relatively minimal. Given the one-sidedness of this issue, it is not necessary to analyze all twelve choice-of-law factors exhaustively. Even without the choice-of-law provision, all roads lead to Massachusetts substantive law.

*2. Enforceability of Restrictive Covenants*

In Massachusetts, a restrictive covenant is enforceable if it "is necessary for the protection of the employer, is reasonably limited in time and space, and is consonant with the public interest ." *Novelty Bias Binding Co. v. Shevrin,* 342 Mass. 714, 716, 175 N.E.2d 374 (1961). Trade secrets, confidential data, and goodwill are all legitimate business interests of the employer that it may seek to protect by restrictive covenant. *New England Canteen Serv., Inc. v. Ashley,* 372 Mass. 671, 674, 363 N.E.2d 526 (1977). However, protection from "ordinary competition" is not a legitimate business interest. *Marine Contractors Co. v. Hurley,* 365 Mass. 280, 287-88, 310 N.E.2d 915 (1974). Nor may an employer prevent an ex-employee from using "the general skill or knowledge acquired during the course of the employment." *Junker v. Plummer,* 320 Mass. 76, 79, 67 N.E.2d 667

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-11129-DPW    Document 93-4    Filed 03/13/2006    Page 7 of 13

Not Reported in F.Supp.2d                                                                                                      Page 6
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
(Cite as: 2003 WL 23112398 (D.Mass.))

(1946).

a. Goodwill

Oxford contends that its employees develop relations with, and specific knowledge of, Oxford customers, and that these relations and detailed knowledge constitute valuable goodwill. Defendants disagree, claiming, first, that they could not have formed relationships with customers with whom they had no personal contact, and second, that in the highly competitive recruiting industry, relationships play virtually no role.

*7 The record before me, the considered opinions of numerous Massachusetts state court judges, and common sense suggest that relationships play at least *some* role in the placement industry. I credit defendants' point that customers do not close placements merely because of their relationship with the recruiter, but rather deal simultaneously with multiple placement agencies, in pursuit of the best match at the best hourly rate. However, this means that goodwill does not play a *dispositive* role in the placement process, not that it plays *no* role. Oxford avers that the majority of its contractor leads come by referral from existing contractors, and defendants--who had managerial roles at Oxford, and would be in a position to know--do not dispute that assertion.

Common sense suggests that, particularly in highly specialized technical fields, positive past placement experiences can play a role. For example, consider a contractor whose area of interest is a certain programming language. If an inexperienced recruiter or account manager mistakenly refers the contractor to a client seeking temporary help involving a different programming language that has a similar name, then both the client and the contractor will be displeased, and, the next time around, will look more favorably on the competing placement service that does not waste their time with inaccurate placements.

Finally, at least three different Massachusetts state court judges have carefully considered the value of goodwill under Massachusetts law in the placement industry, particularly in high-technology fields, and have concluded that it is a significant business asset. See, e.g., Oxford Global Resources, Inc. v. Consolo, 16 Mass. L. Rptr. 415, 2002 WL 32130445, *4-5 (Mass.Super.Ct.2002) (Botsford, J.) (construing the same agreement as here); Darwin Partners, Inc. v. Signature Consultants, LLC, 2000 WL 33159238, *4 (Mass.Super.Ct.2000) (Burnes, J.) (information technology placement); Modis, Inc. v. Revolution Group, Ltd., 11 Mass. L. Rptr. 246, 1999 WL 1441918, *7-8 (Mass.Super.Ct.1999) (Welch, J.) (information technology placement); Fortune Personnel Consultants of Boston, Inc., v. Hagopian, 8 Mass. L. Rptr. 49, 1997 WL 796494, *3 (Mass.Super.Ct.1997) (Welch, J.) (biotechnology and pharmaceutical placement); see also Stone Legal Res. Group v. Glebus, 15 Mass. L. Rptr. 738, 2003 WL 914994, *3 (Mass.Super.Ct.2003) (Burnes, J.) (legal placement).

Therefore, it appears that enforcement of the non-compete clause as to customers with whom defendants established goodwill while at Oxford is "necessary for the protection of the employer," Novelty Bias Binding Co., 342 Mass. at 716, 175 N.E.2d 374. That said, it does not automatically follow that defendants have established goodwill with every customer whose name ever appeared on lists to which they had access. If the employee, during his employment, was "not in a position ... to develop close relationships with a wide range of [the employer's] customers or suppliers," then the employer's goodwill is not at risk. FLEXcon Co., Inc. v. McSherry, 123 F.Supp.2d 42, 45 (D.Mass.2000) (Gorton, J.); cf. All Stainless, Inc. v. Colby, 364 Mass. 773, 777, 308 N.E.2d 481 (1974) (explaining that employer goodwill is harmed "by a former salesman's calling on [the ex-employer's] customer, with whom he had previously dealt, to solicit purchases on behalf of a new employer.").

*8 Here, Oxford seeks an injunction that would apply to customers who appeared not just on defendants' personal A lists, but also the A lists of those they supervised during their last year of employment. The A lists of subordinates comprise some 9000 names for Guerriero, 2600-3200 names for Smith, and 200-340 names for D'Agostino. Without some specific evidence, I cannot find that defendants had close personal relationships with each or even most of these people, most of whom probably would not even recognize defendants' names. The record does not establish that enforcement of the non-compete clause as to customers whom defendants never personally contacted is "necessary for the protection of the employer."

b. Confidential information

Oxford also contends that defendants have violated the confidentiality provision in their employment agreements. Defendants do not dispute that Oxford's database of contractors and corporate clients, including such information as rate information,

Case 1:04-cv-11129-DPW   Document 93-4   Filed 03/13/2006   Page 8 of 13

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
**(Cite as: 2003 WL 23112398 (D.Mass.))**

availability, and skill sets, is confidential. However, they argue that customer names and contact information, which can be easily found via public means, are not confidential. [FN7]

> FN7. It bears noting again that Oxford does not contend that defendants took any confidential materials with them when they resigned. *See supra* note 6.

In Massachusetts, courts assess six factors in determining whether information is confidential:
(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
*Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 840, 282 N.E.2d 921 (1972). A situation where certain information could be obtained publicly, but the ex-employee had access to a confidential superset of that information, poses a complex problem. The mere fact that one could obtain the name and contact information of a customer via public means does not negate confidentiality:

> The fact that certain [ ] customers are well known corporations does not diminish the fact that [the placement firm's information about them] constitutes confidential information.... [I]t is the knowledge of the availability of certain temporary employees or consultants and the linking of them to specific jobs offered by the corporate clients that constitutes the confidential information.
> *Modis,* 1999 WL 1441918 at *8; *Darwin Partners,* 2000 WL 33159238 at *4 (same).

On the other hand, information about a third party is not confidential if competitors could obtain the same information directly from the third party. *See Banner Indus. v. Bilodeau,* 15 Mass. L. Rptr. 705, 2003 WL 831974, *4 (Mass.Super.Ct.2003) (manufacturer lists not confidential because others could obtain same information directly from the manufacturers). Similarly, information obtainable from publicly available sources is not confidential. *Hamburger v. Hamburger,* 4 Mass. L. Rptr. 409, 1995 WL 579679, *2 (Mass.Super.Ct.1995) ("customer lists are not considered trade secrets if the information is readily available from published sources, such as business directories").

*9 In this field, contractor names and resumes are generally available on the Internet, one of defendants' major sources of contractor information. Client contact information can be gathered by asking contractors for whom they currently work, or for whom they have worked in the past--or, more actively, by reading the contractor's resume, noting past employers, and then calling those companies and asking to speak to the engineering manager. Defendants also note that several of the customers specifically identified by Oxford as examples of forbidden contact were identified from conversations with non-Oxford contractors. Another Oxford contractor was discovered by Smith through an Internet search.

On the other hand, one who already knows, or even has a vague recollection of, Oxford's customer list can greatly expedite the searching process. If it were the case that confidentiality simply did not cover any customer whose contact information were available over the Internet, then an unscrupulous ex-employee could "launder" confidential information by working down a memorized list of contractors, methodically performing Internet searches designed to find the exact person they already have in mind, and saving the results of those searches as a defense against any claims of breach of confidentiality. Less dramatically, an ex-employee who has even a partial memory of confidential information could use that information to expedite and rapidly narrow an Internet search. [FN8]

> FN8. As a pure hypothetical, consider the difference between searching for a contractor with experience in Java (a programming language), and searching for a contractor with experience in Java who lives in Tulsa, is named Steven or Stephen, and once worked for the Department of Defense. Alternatively, consider the difference between a recruiter who calls a list of contractors about whom the recruiter knows nothing other than their publicly available resumes, and a recruiter who looks at that list, and immediately focuses on a particular contractor who (the recruiter suddenly remembers) likes to travel to the exact location where the client is located, while avoiding another contractor who (the recruiter remembers) interviews poorly despite an impressive resume.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-11129-DPW    Document 93-4    Filed 03/13/2006    Page 9 of 13

Not Reported in F.Supp.2d                                                                                                       Page 8
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
(Cite as: 2003 WL 23112398 (D.Mass.))

Once again, I place weight on the distinction between customers whom defendants contacted personally and exclusively for Oxford, as reflected on defendants' A lists, and customers whose information defendants might have seen once or twice as part of their managerial duties. It is possible that, with sufficient discovery, Oxford might somehow prove that defendants carefully memorized their subordinates' A lists in their final weeks before resigning-- but there is no such evidence before me now. The record at this stage of litigation establishes that enforcement of the confidentiality clause as to defendants' own A lists, and for defendant D'Agostino, any other customers that he was personally involved in placing, is "necessary for the protection of the employer," *Novelty Bias Binding Co.*, 342 Mass. at 716, 175 N.E.2d 374. However, there is insufficient evidence that enforcement as to customers whose only connection was presence on a subordinate's A list is necessary. [FN9]

> FN9. There are isolated instances where Oxford can establish that a defendant had specific confidential knowledge concerning one or more of his subordinate's customers. Enforcement of the confidentiality agreement as to such customers would also be necessary for Oxford's protection.

c. Reasonably limited in time and space

The restrictive covenants are limited to twelve months from the termination of employment. Given the duration of defendants' employment, I find that a twelve month period is reasonable. *Cf. All Stainless, Inc. v. Colby*, 364 Mass. 773, 778-79, 308 N.E.2d 481 (1974) (holding that two year restrictive covenant was reasonable in time); *Frank D. Layne Assoc. v. Lussier*, 16 Mass.App.Ct. 986, 989, 454 N.E.2d 109 (1983) (same); *Middlesex Neurological Assoc., Inc. v. Cohen*, 3 Mass.App.Ct. 126, 131, 324 N.E.2d 911 (1975) (same).

*10 The restrictive covenants are not limited in space at all. However, Oxford is a nationwide recruiting firm that operates throughout the country using telephone and Internet-based methods to match far-flung contractors and corporate clients. [FN10] Oxford's (and defendants') business is therefore unlike a more traditional sales or services position, where the value of goodwill and confidentiality diminishes rapidly beyond a certain radius. In light of this business reality, I find it reasonable to enforce the restrictive covenants on a nationwide basis.

> FN10. At oral argument, Oxford's counsel stated that its eighteen offices nationwide do *not* divide customers by geographical territory. Thus, defendants, operating from Texas, compete directly with virtually every Oxford office.

d. Public interest

In cases involving restrictive covenants between private parties performing private work, analysis of the "public interest" prong is usually confined to brief platitudes. While "the public and the individual have an interest in every person carrying on his trade or occupation freely," *Woolley's Laundry v. Silva*, 304 Mass. 383, 387, 23 N.E.2d 899 (1939), it is also "beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent." *New England Tree Expert Co. v. Russell*, 306 Mass. 504, 508-09, 28 N.E.2d 997 (1940). Fortunately, the test is not whether enforcing the restrictive covenant would *advance* the public interest, but, more simply, whether enforcement would be "consonant with the public interest," *Novelty Bias Binding Co.*, 342 Mass. at 716, 175 N.E.2d 374, or "not injurious to the public interest," *Woolley's Laundry*, 304 Mass. at 387, 23 N.E.2d 899.

While the inability of these three defendants to make contract employment placements with the few hundred contractors and clients involved could result in a minuscule loss of lubrication in the information technology economy, that loss is offset by the fact that Oxford (and competitors not bound by these restrictive covenants) will remain able to bridge the distance between contractor and client. I find enforcement of these covenants essentially as to defendants' own A lists to be consonant with, not injurious to, the public interest.

C. *Risk of Irreparable Harm*

Oxford contends that defendants' continued solicitation of Oxford customers will result in erosion of its goodwill, and that this is a severe consequence for a sales-driven firm. Oxford further asserts that the damage attributable to this type of injury is difficult to monetize, and therefore no adequate compensatory relief would be available in an action at law. *See K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989) ("[H]arm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages--and for that reason, more likely to be found 'irreparable.' ").

Defendants respond that loss of goodwill is in fact

Case 1:04-cv-11129-DPW    Document 93-4    Filed 03/13/2006    Page 10 of 13

Not Reported in F.Supp.2d                                                                                          Page 9
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
(Cite as: 2003 WL 23112398 (D.Mass.))

readily monetizable, and that courts often deny preliminary injunctions on precisely this ground. *See IKON Office Solutions, Inc. v. Belanger,* 59 F.Supp.2d 125, 132 (D.Mass.1999) (Ponsor, J., adopting report of Neiman, M.J.) (loss of goodwill not irreparable because if salesman were later found to have lured customers away, employer could seek money damages); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop,* 839 F.Supp. 68, 75 (D.Me.1993) ("Loss of good will is frequently valued and recompensed in litigation. There is shown to be no pattern of insufficiency in such damage awards or any systemic obstacles to their fruition."). Furthermore, defendants note that, in at least one instance, Oxford has *already* begun to calculate money damages, and filed the basis for those damages in this very action.

*11 Without an injunction, Oxford could sue for money damages, and calculation as to how much commission defendants' employers earned from placements involving Oxford customers is manageable. It would also be possible--though more difficult and speculative--for experts to project a future earning loss from the continued patronage of those customers to defendants rather than to Oxford. No doubt, for these reasons, the rule in Massachusetts is that "[e]conomic harm alone ... will not suffice as irreparable harm unless 'the loss threatens the very existence of the movant's business.'" *Tri-Nel Mgmt., Inc. v. Bd. of Health,* 433 Mass. 217, 227-28, 741 N.E.2d 37 (2001) (quoting *Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co.,* 399 Mass. 640, 643, 506 N.E.2d 140 (1987)).

However, these damage measures would not fully capture goodwill, which is not just lost sales, but lost reputation. Oxford has alleged that defendants have made derogatory statements about Oxford to customers, which may not show up immediately on a balance sheet but irreparably harms Oxford's market goodwill. This type of harm is not easily measured, and Massachusetts courts have generally recognized, in the context of restrictive covenants, that the "task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one." *Kroeger v. Stop & Shop Co.,* 13 Mass.App.Ct. 310, 322, 432 N.E.2d 566 (1982); *Modis,* 1999 WL 1441918, at *9 (harm to goodwill of technology placement firm would be irreparable).

Defendants also argue that Oxford delayed unreasonably in seeking a preliminary injunction, and that such delay belies its claims of irreparable harm. Oxford knew of defendants' activities by August 28, 2003, but did not file a complaint until October 6, 2003, and did not move for a preliminary injunction until November 21, 2003. I find that this delay was not unreasonable in order to bring a well-founded motion for a preliminary injunction. The cases defendants cite are distinguishable because they involve far longer delays. *See Castro v. United States,* 775 F.2d 399, 408 (1st Cir.1985) (plaintiff waited one year to file suit); *Read Corp. v. Powerscreen of Am., Inc.,* 26 F.Supp.2d 204, 207-08 (D.Mass.1998) (Tauro, C.J.) (plaintiff waited six years to file suit).

D. *Balance of Hardships*

I must now analyze the hardship that defendants will suffer if a preliminary injunction *does* issue, and determine whether that harm significantly exceeds the hardship that Oxford will suffer if a preliminary injunction does *not* issue. Because I have determined that essentially the only set of customers reasonably covered by the restrictive covenants are those on defendants' A lists during their final year at Oxford, this question is not difficult to resolve.

If Oxford receives preliminary relief, defendants will be prohibited from contacting a fairly tiny slice of the total market. Given this narrow scope, defendants will not suffer severe hardship. I therefore find that, under these circumstances, the hardship to defendants from the covenant as I have construed it is quite minor. [FN11] I will, however, impose a fifty thousand dollar bond as security against the improvident entry of interlocutory relief.

> FN11. A separate but related issue is how the injunction would be implemented, and whether the manner of implementation would itself work a hardship on defendants. I address this issue below.

E. *Public Interest*

*12 As a formal matter, the question (under federal law) whether a *preliminary injunction* will harm the public interest is distinct from the prior question (under Massachusetts law) whether enforcement of the covenant *at all* (i.e., in a suit for damages) will harm the public interest. That said, I find that the same analysis applies, and reincorporate by reference my findings above. *See supra* Section II.B.2.d.

F. *Unclean Hands*

Defendants raise the affirmative equitable defense of "unclean hands" on two grounds. First, Guerriero and D'Agostino argue that they left Oxford only after Oxford acted deceitfully towards them. [FN12]

Case 1:04-cv-11129-DPW   Document 93-4   Filed 03/13/2006   Page 11 of 13

Not Reported in F.Supp.2d                                                                      Page 10
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
(Cite as: 2003 WL 23112398 (D.Mass.))

Second, and more saliently, it emerged during the pendency of this litigation that an Oxford account manager, with the permission (or even under the orders) of a company vice president, called a contractor and a client that defendant Smith had placed, impersonated Smith, and attempted to scuttle the placement and destroy Smith's relationship with both.

> FN12. Specifically, Guerriero states that he resigned only after Oxford's CEO reneged on a promise to give him a $30,000 raise if he moved from Arizona to Massachusetts. D'Agostino states that he resigned only after Oxford (1) reneged on a promise to relocate him from Washington back to Massachusetts if he so chose after one year, (2) reneged on a promise to promote him, and (3) attempted, through its CEO, to interfere with his relationship with his girlfriend so he would lose interest in relocating to Massachusetts.

Based on affidavits submitted by Smith and Guerriero, and, more importantly, sworn testimony received in court on December 15, 2003, the following picture emerges. In October or November 2003, Oxford account manager Scott Kazanjian learned that defendant Smith had successfully placed contractor Alexander Novositsky with Steven Dick, a hiring manager at Northrup Grumman, who was Kazanjian's client.

While Kazanjian and Vice President Joseph Quirk differ as to some important details, the facts on which they agree are damning. Kazanjian, with the permission of (and possibly at the orders of) Quirk, telephoned Dick's administrative assistant and impersonated Smith so as to learn the name of the contractor (i.e., Novositsky). With the contractor's name in hand, Kazanjian then telephoned Novositsky, and pretended again to be Smith. He informed Novositsky that the job at Northrup Grumman had been cancelled, and he should find other work. Novositsky was understandably upset, and Kazanjian (possibly at Quirk's orders) "got belligerent" with him, and told him he would never work with DCRI (Smith's current employer) again. Either Quirk or Kazanjian swore at Novositsky, and when Novositsky heard a second voice in the background and asked who it was, Kazanjian told him it was Guerriero. Finally, either Kazanjian or Quirk called Dick, again pretending to be Smith, and told him that Novositsky would be unavailable for work.

The inequitable nature of this conduct requires little explanation, and to its credit, Oxford (through counsel) has conceded the inequitable, "ill-considered, sophomoric," and "decidedly embarrassing" nature of the incident. It would be bad enough if the scheme were the product of one misguided employee; it is far worse that the conduct was sanctioned, even if not directed, by a corporate vice president--while this litigation was pending. Moreover, Oxford *qua* corporation certainly knew of the incident as of November 21, 2003, when it moved for a preliminary injunction. Defendants apparently served Oxford with their initial disclosures on November 14, 2003, identifying Kazanjian as an individual likely to have discoverable information concerning "the impersonation of David Smith to contractors." One week later, Oxford brought this motion for preliminary injunction, and included affidavits of both Quirk and Kazanjian; Kazanjian was brazen enough to attribute his damaged relationship with Dick (and Northrup Grumman) to Guerriero. Just two days later, defendants filed an Amended Answer and Counterclaim alleging the basic facts of the incident.

*13 Since all parties agree on the reprehensibility of the conduct, the question is what to do. Defendants, relying on the maxim that "he who comes into equity must come with clean hands," *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), argue that this incident so taints Oxford's case that it should be denied all equitable relief. Oxford concedes that its hands were unclean, and voluntarily narrows the scope of relief sought, but argues that the balance of equities still favors the issuance of a more limited injunction.

Courts have held that the doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id.* Under this approach to the doctrine, motions for preliminary injunctions have been denied where the employer was found to have engaged in the very conduct it was attempting to prohibit. See *Morgan Stanley DW, Inc. v. Frisby,* 163 F.Supp.2d 1371, 1380 (N.D.Ga.2001) (denying employer's motion for preliminary injunction to enforce restrictive covenant where employer regularly hired brokers from competitors and thus engaged in the same conduct it sought to prohibit by injunction); *Salomon Smith Barney, Inc. v. Vockel,* 137 F.Supp.2d 599, 603

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-11129-DPW   Document 93-4   Filed 03/13/2006   Page 12 of 13

Not Reported in F.Supp.2d                                                                                Page 11
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
(Cite as: 2003 WL 23112398 (D.Mass.))

(E.D.Pa.2000) (denying motion for preliminary injunction to enforce restrictive covenant where employer instructed employee, hired from competitor, to contact his clients from his former employer).

On the other hand, an isolated misstep need not bar *all* relief to the movant. *See Kusan, Inc. v. Fairway Siding Corp.,* 7 U.S.P.Q.2d (BNA) 1202, 1988 WL 96577, *12 (D.Mass.1988) (Freedman, C.J.) ("[A]lthough plaintiff's misuse of the registration symbol is significant, the evidence presented does not demonstrate such a consistent and deliberate misuse of the symbol as would bar plaintiff from relief."). Furthermore, the unclean hands doctrine is a double-edged sword: the party that asserts the defense cannot itself have materially soiled hands. *See Leo Feist, Inc. v. Young,* 138 F.2d 972, 975 (7th Cir.1943) ("[I]f the defendant has been guilty of conduct more unconscionable and unworthy than that of the plaintiff, the rule may be relaxed."); *Duggal v. Krishna,* 554 F.Supp. 1043, 1047 (D.D.C.1983) (same).

In this case, I find that inequitable conduct attributable to Oxford does not descend so far as to bar all relief, especially in light of defendants' apparent parallel practice of calling Oxford contractors and attempting to dissuade them from working with Oxford. Although defendants' attempts to take their former clients from Oxford at least were done under their own names, Kazanjian and Quirk's adventure in impersonation should not grant defendants a complete license to solicit their former clients. Instead, I will consider Oxford's inequitable conduct in shaping the scope of relief.

### III. CONCLUSION AND ORDER
*14 Based on the findings of fact and conclusions of law set forth above, and in my equitable discretion, I make the following injunctive orders:

1. Oxford's motion for a preliminary injunction is granted as to contractors or clients on each defendant's own A list during that defendant's last year at Oxford. For defendant D'Agostino, the injunction further extends to any contractor that D'Agostino was personally involved in placing during his last year at Oxford. [FN13]

> FN13. There appears to be a dispute over the accuracy of each of these lists. Until this dispute is resolved by the parties or by the court, the relevant lists are defined to be the names listed in the appropriate exhibits to the Second Declaration of Bruce Winchester. (*See* Winchester Second Decl. Exs. A (Guerriero A list), H (Smith A list), L (D'Agostino A list), M (D'Agostino placements).) Those lists are attached hereto in a sealed form.

2. Pending further order of this court, the preliminary injunction shall terminate on June 23, 2004 for Guerriero, June 20, 2004 for Smith, and July 11, 2004 for D'Agostino.

3. Oxford shall, on or before January 7, 2004, submit for my approval a proposed letter to be sent to each person whom any defendant is, pursuant to paragraph 1 *supra,* enjoined from contacting. The letter shall explain that this litigation is pending, and that defendants are subject to a preliminary injunction barring them from contacting the recipient. The letter shall also detail the incident in which Kazanjian and Quirk impersonated defendant Smith.

4. Oxford shall post a fifty thousand dollar bond;

5. The declarations of Scott Kazanjian and Joseph Quirk are stricken from the record, and they will not be permitted to submit further affidavits, or testify on behalf of Oxford as to any matter in this case. Defendants will be permitted to depose Kazanjian and Quirk, and to introduce any testimony from their affidavits or depositions, or call them at trial, subject to Oxford's rights to assert the doctrine of completeness or to cross examine within the scope of any direct testimony elicited by defendants.

Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2782385 (Trial Motion, Memorandum and Affidavit) Plaintiff Oxford Global Resources, Inc.'s Response to Defendants' Opposition to Oxford's Proposed Preliminary Injunction Order (Jan. 09, 2004)

• 2004 WL 2782384 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiff's Proposed Order (Jan. 2004)

• 2003 WL 23921281 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction (Dec. 19, 2003)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23112398 (D.Mass.)
**(Cite as: 2003 WL 23112398 (D.Mass.))**

Page 12

- 2003 WL 23921284 (Trial Motion, Memorandum and Affidavit) Plaintiff Oxford Global Resources, Inc.'s Supplemental Preliminary Injunction Memorandum Regarding the Defendants' Equitable Affirmative Defense of the "unclean Hands" Doctrine%n1%n (Dec. 19, 2003)

- 2003 WL 23921277 (Trial Motion, Memorandum and Affidavit) Oxford Global Resources, Inc.'s Reply to Defendants' Counterclaims (Dec. 16, 2003)

- 2003 WL 23921272 (Trial Motion, Memorandum and Affidavit) Plaintiff Oxford Global Resources, Inc.'s Reply Memorandum of Law (Dec. 12, 2003)

- 2003 WL 23921266 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiff's Motion for Preliminary Injunctive Relief (Dec. 08, 2003)

- 2003 WL 23921269 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiff's Motion for Entry of Protective Order (Dec. 08, 2003)

- 2003 WL 23921550 (Trial Pleading) Defendants' Amended Answer to Plaintiff's Amended Complaint and Counterclaim (Nov. 23, 2003)

- 2003 WL 23921258 (Trial Motion, Memorandum and Affidavit) Plaintiff Oxford Global Resources, Inc.'s Memorandum of Law in Support of its Motion for Preliminary Injunction (Nov. 21, 2003)

- 2003 WL 23921263 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion to Impound of Sworn Statements and Memorandum of Law Filed in Support of Request for Preliminary Injunction (Nov. 21, 2003)

- 2003 WL 23921546 (Trial Pleading) Defendants' Answer and Jury Demand to Plaintiff's Amended Complaint (Nov. 03, 2003)

- 1:03cv12078 (Docket) (Oct. 27, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.